In the Matter of Enid THOMPSON, Debtor,

Enid THOMPSON, Plaintiff,

v.

BANK OF COMMERCE, Dartmouth Plan, Inc., and Glenn Street Builders, Inc., Defendants.

Bankruptcy No. 181–11187.

Adv. No. 181–0283.

United States Bankruptcy Court, E. D. New York.

Jan. 14, 1982.

Rudick, Kirschner & Rikon, New York City, for plaintiff; Michael Rikon, New York City, of counsel.

Harry Gurahian, New York City, for defendant, Bank of Commerce; Ernst L. Bendix, New York City, of counsel.

Pester, Goldberg & Schiff, Carle Place, for defendant, Dartmouth Plan, Inc.; Stanton Karnbad, Garden City, of counsel.

MANUEL J. PRICE, Bankruptcy Judge.

This is an action brought by Enid Thompson, the debtor herein, against the Bank of Commerce (The Bank), The Dartmouth Plan, Inc. (Dartmouth), and Glenn Street Builders, Inc. (Glenn) to vacate and set aside a second mortgage dated July 17, 1979, in the sum of $8,000 on her home at 1354 Pinson Street, Far Rockaway, Queens, New York, on the ground that her signature and that of her husband, Ralph Thompson, were forged, that it was fraudulently prepared, executed and recorded, and for the rejection of the secured claim filed by the Bank based upon it. The Bank and Dartmouth have each interposed an answer denying the allegations of the complaint. Glenn is out of business and has defaulted.

These are the facts:

The debtor filed a petition for relief pursuant to Chapter 13 of the Bankruptcy Reform Act of 1978 (The Bankruptcy Code or the Code), 11 U.S.C. § 1301 et seq. on April 9, 1981. She listed the Bank in paragraph 11 of her Chapter 13 Statement as an unsecured creditor for $10,098.47. On May 13, 1981, the Bank filed a proof of claim as a secured creditor in that amount and filed a rejection of the debtor's plan.

The debtor and her husband are the owners of a two-family house at 1354 Pinson Street, Far Rockaway, Queens, New York. They have not been living together since sometime in 1976. On June 13, 1979, one Jeff Cole (Cole), a door-to-door salesman employed by Glenn, a company engaged in the home repair and improvement business, came to her home to solicit business. At that time, she had a "bad roof" (S.M. p. 8, 1. 21), so she admitted him because she could see "no harm" in seeing "what they [sic]

have to offer" (*id.* 11. 21–22). She and Cole discussed the work which was to be done on her home and the method of payment. In order to induce her to sign the agreement, he told her that the payments would not start until October (*id.* 11. 24–25). She then entered into a "Home Improvement Agreement" with Glenn whereby she agreed to pay $8,000 for a new roof and various other improvements provided for therein. She signed her name to the agreement and, at Cole's direction, she signed her husband's name thereto (S.M. p. 12, 11. 3–4; Exhibit 1).

Although, pursuant to the terms of the agreement, she had three business days to cancel the transaction (June 13, 1979 was a Wednesday so she had until midnight of Monday, June 18, 1979 to cancel) and although the work was not to start until Cole "[got] back" to her with the credit terms, the materials necessary to perform the work were delivered by the end of the week (S.M. p. 12, 1. 22—p. 13, 1. 3; 1. 18–21).

About a week or a week and a half thereafter, Cole returned and asked her to sign various other documents which she signed in blank after which he left her a copy of the agreement and the completion certificate.

Glenn evidently had a financing arrangement with Dartmouth which, in turn, had such an arrangement with the Bank, for shortly thereafter she received a letter from Dartmouth, dated June 19, 1979, advising her that her "Retail Instalment Obligation to finance [her] property modernization [would] be assigned by The Dartmouth Plan" to the Bank of Commerce and then the "net amount [of] $8,000" was to "be repaid in 120 equal installments of $130.25 per month" (Exhibit 5). Upon receipt of the letter, the debtor called the Bank and told the person with whom she spoke that she had not received any papers in connection with the financing and was told "not to worry, because no monies [would] be paid out until they [*sic*] receive a copy from the Glenn Street Builders or Jeff Cole, to verify that the job was completed, and they [*sic*] then [would] pay them" (S.M. p. 52, 1. 18—

p. 53, 1. 6). Thereafter she received a coupon payment book from the Bank and she commenced making payments of $130.25 which she continued until she ran into financial difficulty which caused her to file the petition for relief.

The debtor was the only witness called on her behalf. She admitted that she signed her name and her husband's to the "Home Improvement Agreement" dated June 13, 1979 (Exhibit 1) and she admitted that she signed her name to the "Completion Certificate" dated June 13, 1979 (Exhibit 2). However, she denied that she signed her name or husband's name to the "Credit Application" (Exhibit 3), the "Retail Instalment Obligation" dated June 13, 1979 (Exhibit 4), the "Mortgage Agreement" dated July 17, 1979 (Exhibit 6), or the "Buyer's notice of the right to rescind" dated June 13, 1979 (Exhibit A) although she admitted that the signatures looked like her handwriting.

The Bank and Dartmouth called as their principal witness a handwriting expert, Joseph P. McNally, a retired captain of the New York City Police Department. He testified that he had compared the signatures on the documents which the debtor denied signing with the signatures which she conceded were hers, namely, those on Exhibits 1, 2 and B, one through six, which consisted of six of her personal checks and had come to the conclusion that the debtor had signed her name and that of her husband to the questioned documents.

Mr. McNally's qualifications were impeccable. He testified as to his training and experience at great length and his qualifications were conceded by the attorney for the debtor (S.M. p. 64, 1. 13—p. 68, 1. 3). He described, in detail, his analysis and the comparison which he made of the genuine signatures with the questioned ones and gave the reasons for his conclusion that the debtor had signed them both. His testimony was clear, unequivocal and convincing and I accept his conclusion that the debtor signed her name and that of her husband to the various questioned documents including the mortgage.

It is the defendants' contention that the only issue to be decided in this case is "was the mortgage duly signed by the plaintiff, and did she also sign Ralph Thompson's name thereto?"

"If the Court holds that the mortgage was duly signed by plaintiff, the adversary proceeding must be dismissed." (Defendants' Post-Trial Memorandum of Law, p. 4)

I disagree. Since the debtor has raised the contention that the mortgage in question was fraudulently prepared, executed and recorded there must be a finding that she knowingly entered into it and that it was not obtained by fraudulent misrepresentations. *Triad Distributors, Inc. v. Conde*, 56 A.D.2d 648, 391 N.Y.S.2d 897 (App.Div., 2d Dept.), *leave to appeal denied*, 42 N.Y.2d 803 (1977); *Roscoe v. Safford*, 61 A.D. 289, 70 N.Y.S. 309 (App.Div., 3d Dept. 1901); *Blum v. Hoffkins*, 210 A.D. 748, 206 N.Y.S. 587 (App.Div., 2d Dept. 1924), *aff'd*, 244 N.Y. 531, 155 N.E. 883 (1926).

Let us examine the circumstances under which the mortgage and the other documents were signed. The only witness to the actual events which occurred in connection with the home improvement contract involved in this case who testified herein is the debtor. No attempt was made by the defendants to locate or subpoena Cole, the door-to-door salesman who sold the debtor a job for $8,000, which actually turned out to cost $15,630 (*see* Plaintiff's Exhibit 4). Except for the question of the signatures, her testimony is uncontroverted. It is to the effect that she never was told by Cole that she would have to mortgage her home in order to have the work done. Her testimony on that score is perfectly clear:

"Q Would you have signed a mortgage?

"A No way I could have signed another mortgage.

"Q Did Mr. Cole ever ask you to sign this document?

"A I don't remember him telling me anything about any mortgage document or anything.

"Q When you entered into the agreement on June 13, 1979, to have home repairs done on your building, did Mr. Cole tell you that you would have to put a mortgage on your property?

"A No.

"Q How did he say you would have to pay for the work?

"A He said it would be through the bank. The arrangements would be made through the bank, and not to worry, the bank will get in touch with me about whatever the proceedings would be." (S.M. p. 24, 11. 10–24).

The Bank and Dartmouth have attempted to portray the debtor as a sophisticated person who has had experience in business transactions, including the purchase of her home, a car, a lot in Florida under an installment land purchase agreement and therefore contend that she was told, or should have known, that a mortgage would be required for a transaction of this size. From my observation of the debtor, she struck me as the typical unsophisticated consumer who fell into the hands of an unscrupulous, high pressure, door-to-door salesman who was only interested in getting her name and her husband's name on a contract which I believe was the only document completely filled in in her presence. I believe her testimony that she signed her husband's name on the documents at Cole's direction and that she signed whatever he asked her to without questioning him.

From an examination of the documents in evidence, it appears that the "Home Improvement Agreement" (Exhibit 1), the "Buyer's notice of the right to rescind" (Exhibit A), the "Credit Application" (Exhibit 3), and the "Retail Instalment Obligation" (Exhibit 4) were signed on June 13, 1979. All of the documents, except the "Credit Application" which is undated, bear that date. Dartmouth's letter to the debtor, dated June 19, 1979 (Exhibit 5), refers to the prospective assignment of the "Retail Instalment Obligation" to the Bank which is subject to verification of the debtor's employment and to the mortgage on the

property being current. Dartmouth therefore must have had the "Retail Instalment Obligation" and the information contained in the "Credit Application" else how could it refer to them?

Although the "Completion Certificate" (Exhibit 2), is dated June 13, 1979, I believe that it was signed, as the debtor testified, a week or a week and a half thereafter when Cole came to her home for the second time. It seems typical of this entire transaction, and the carelessness with which it was handled .by Dartmouth and the Bank, that neither of them has attempted to explain why the debtor's signature on this document, which she admits signing, was not witnessed by Cole, who was there and who purportedly witnessed all of the other signatures, including that of the absent Ralph Thompson, on all of the other documents, but by someone whose name appears to be William Comeglacy, a complete stranger, whose name has not been mentioned in these proceedings. In my opinion, at the same time, Cole had the debtor sign her name and her husband's to the "Mortgage Agreement" (Exhibit 6), in blank, without telling her what it was. Sometime thereafter, it was filled in and both signatures were witnessed by Cole. The mortgage is dated "7/17/79", purportedly the date when it was signed and witnessed. The signatures of the debtor and her husband were not acknowledged, instead, the acknowledgement states that on "7/13/79", four days prior to its purported execution, *Cole* swore that he had seen "Enid Thompson [and] Ralph Thompson sign this mortgage, and that [he] then signed his own name."

There is no question but that the mortgage is false and fraudulent as to Ralph Thompson. As to him, it is a blatant forgery. The testimony of the defendants' own expert witness, McNally, is to the effect that the debtor signed his name as well as hers to this mortgage (S.M. p. 70, 1. 21—p. 71, 1. 6). The debtor's testimony that she signed her absent husband's name to the documents at Cole's direction is uncontroverted, yet he has sworn in the acknowledgement that he saw them *both* sign the mortgage. Cole's acknowledgement as a witness is obviously false.

As I have stated, it is my opinion that Cole never told the debtor that she would be required to mortgage her home in order to finance the repairs provided for in the "Home Improvement Agreement." I believe her testimony that she never would have entered into it if she had known. In the context of this case, I am convinced that she signed the mortgage in blank without knowing what it was and that it was procured through the trick and device of Cole and is therefore void as against the debtor and her husband. *Marden v. Dorthy*, 160 N.Y. 39, 54 N.E. 726 (1899); *Rapps v. Gottlieb*, 142 N.Y. 164, 36 N.E. 1052 (1894); *Roscoe v. Safford*, 61 A.D. 289, 70 N.Y.S. 309 (App.Div., 3d Dept. 1901); *Blum v. Hoffkins*, 210 A.D. 748, 206 N.Y.S. 587 (App.Div., 2d Dept. 1924), *aff'd*, 244 N.Y. 531, 155 N.E. 883 (1926); *Triad Distributors, Inc. v. Conde*, 56 A.D.2d 648, 391 N.Y. S.2d 897 (App.Div., 2d Dept.), *leave to appeal denied*, 42 N.Y.2d 803 (1977).

Judgment is granted in favor of the plaintiff-debtor as follows:

1. The mortgage dated July 17, 1979 between the Dartmouth Plan Inc., as mortgagee and Enid and Ralph Thompson as mortgagors on premises 1354 Pinson Street, Far Rockaway, Queens, New York, recorded in the office of the City Register, Queens County, on July 23, 1979 in Reel 1180 of Mortgages page 395 and the assignment of said mortgage by the Dartmouth Plan Inc., as assignor to Bank of Commerce on July 23, 1979 in Reel 1180 of Mortgages page 394 are null and void as a lien on the said premises.

2. The secured claim of the Bank of Commerce in the sum of $10,098.47 based upon a judgment obtained by the said Bank on January 7, 1981 in the Supreme Court of the State of New York, Queens County and upon the aforesaid mortgage and assignment is reclassified as an unsecured claim in that amount.

Submit judgment in accordance herewith.